UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DOHERTY MICHAEL JARREAU

VERSUS

LAMAR QUACKENBUSH AND
DIANE QUACKENBUSH

CIVIL ACTION

NUMBER 08-557-SCR

## OPINION

For the reasons that follow, which shall constitute the court's findings of fact and conclusions of law issued pursuant to Rule 52(a)(1), Fed.R.Civ.P., judgment will be entered in favor of the plaintiff Doherty Michael Jarreau and against defendants Lamar Quakenbush and Diane Quakenbush in the amount of $18,944.[1]

## Background

During the time relevant to this suit, defendants Lamar and Diane Quakenbush owned a horse named View This Jet.[2]  Plaintiff Doherty Michael Jarreau owned horses and he and his wife Susan Jarreau financed their daughter Jana Jarreau's participation in professional rodeo events across the county.  Jana had competed in various equine events for the past 20 years, and for approximately

---

[1] Defendants' last name was spelled incorrectly in the Notice of Removal, in some subsequent pleadings and in docket entries. The correct spelling is used in the body of this opinion.

[2] Hereafter referred to as Jet.

the past seven years focused on barrel racing.[3]  In 2007 and 2008 the plaintiff supported Jana Jarreau's competition in WPRA rodeos and other events with the goal of going to the NFR in 2008, which was described by the plaintiff and other witnesses as the "Super Bowl" of barrel racing.[4]  In order to compete at this level Jana needed a "big arena" horse.  Defendants' horse Jet fit this description and there is no dispute that Jet could compete well in any arena.[5]

In the second half of 2007 another individual was riding Jet in competitions.  Diane Quakenbush was dissatisfied with that person and expressed this opinion to Susan Jarreau[6] at an event in Idaho.  Susan suggested that Diane talk to Jana about riding Jet. In the fall of 2007 the defendants contacted Jana about riding Jet in competitions, and she told them to talk to her father.  The parties ultimately met in Oregon so that Jana could try out Jet. The parties met later at plaintiff's residence in Louisiana to

---

[3] At the time of the trial Jana was 25 years old.

[4] WPRA is the Women's Professional Rodeo Association and NFR is the National Finals Rodeo.  Although no evidence was submitted to identify these organizations, they are readily identifiable from reliable sources.  The court takes judicial notice of these organizations under Rule 201, Fed.R.Evid.  *See*, http://www.wpra.com and http://www.prorodeo.com.

[5] Plaintiff described Jet as the best he had ever seen and the "Big Brown" of barrel racing.

[6] At the time they were both attending the same rodeo.

discuss making an agreement for Jana to ride Jet in 2008.[7]  Jana actually began riding Jet in barrel racing events beginning in February 2008 and she competed on Jet until the beginning of May 2008.[8]

Plaintiff filed suit against the defendants in state court on July 18, 2008.  Plaintiff alleged that in late 2007 and early 2008 he entered into discussions and ultimately a joint venture agreement with the defendants for Jana to ride Jet in various rodeo events.  After this agreement was reached she was entered to compete in events throughout 2008.  Plaintiff alleged further that the defendants were obligated to bring Jet to the entered events, transporting him in the plaintiff's 2005 Elite horse trailer and returning the trailer to the plaintiff after the NFR.  According to the plaintiff's petition, he and defendants agreed to share equally in the winnings after deducting the entry fees paid by him, and he would pay for other costs of the venture such as fuel, stall fees and supplies.  Plaintiff claimed that the defendants breached the agreement when they let someone else ride Jet in 2008 and failed to show up with Jet at events in which the parties had agreed to participate.

---

[7] Plaintiff testified that he did not want to interfere in the defendants' agreement with the person who was riding Jet in 2007.

[8] Jet was injured and died in September 2008, after the events which form the basis for this litigation occurred.

3

Plaintiff asserted that the defendants' breach of the joint venture agreement caused various losses for which he seeks to recover damages.  Plaintiff alleged that his horse trailer was returned with damage beyond normal wear and tear, and the defendants are responsible for this damage which occurred while they had possession of it.  Plaintiff also claimed that the defendants are liable for the entry fees paid by him for events that the defendants failed to bring Jet.  In addition, the plaintiff sought to recover $2,500 and $500 loans he made to the defendants, $600 he paid to William Scott McGrew to transport a horse for the benefit of the defendants, and $1,400 he paid to McGrew to retrieve his trailer in June 2008.  Plaintiff asserted that the defendants agreed to repay the loans by February or March 2008 but they failed/refused to do so.

Defendants removed the case based on diversity jurisdiction and raised several defenses and counterclaims against the plaintiff.  With regard to the loans and payments made to others on their behalf, the defendants averred that they did not fail to repay the loans because there was no definite term to pay them, and in the alternative asserted that either they or another individual acting on their behalf, Ashley Sheppard, offered to pay the money but the plaintiff refused to accept it.  Defendants argued that the plaintiff is estopped from claiming he is entitled to repayment. As to the alleged damage to plaintiff's trailer, the defendants

claimed that while the trailer was in their possession it did not sustain any damage beyond normal wear and tear, and any damage to the trailer was caused by the plaintiff or other persons over which they had no control.

Defendants asserted several defenses to the plaintiff's claims for breach of contract and damages.  Defendants claimed that they were told by Susan Jarreau that a written contract would be drawn up.  Since one was never drawn up and signed, the defendants argued that no contract was formed.  If a contract existed, the defendants asserted several reasons why they are not liable to the plaintiff for breach of contract: (1) the plaintiff has no standing to sue for breach of contract and damages because he did not use Jet, and his wife and daughter made the agreement and paid the money to fund the joint venture; (2) performance of the contract became impossible when the defendants were sick and physically unable to perform, that is, travel and bring Jet to events out West; and (3) the plaintiff suffered no damages as a result of the defendants inability to appear at events because he owned horses that traveled with his wife and daughter, which his daughter was able to ride in the events she had entered.

Defendants also counterclaimed against the plaintiff for conversion in connection with the plaintiff retaining possession of their horse trailer.  Defendants asserted that the plaintiff's conversion of their trailer injured them and as a result they are

entitled to damages for lost income, inconvenience and mental anguish.

The parties consented to try this case before a magistrate judge pursuant to 28 U.S.C. § 636(c). A bench trial was held and the parties submitted pretrial and post-trial memoranda.

## Applicable Law

### Louisiana Law of Obligations and Contracts

Numerous Louisiana Civil Code articles on the general law of obligations and contracts are applicable in this case. The principles set forth in these articles are cited and paraphrased as follows.

A joint venture arises only where the parties intend the relationship to exist and it is ultimately predicated upon either an express or implied contract. *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Authority,* 2004-0211 (La. 3/18/04), 867 So.2d 651, 663. Whether a contract exists is a question of fact. *Townsend v. Urie*, 2000-0730 (La.App. 1st Cir.5/11/01), 800 So.2d 11, 15, *writ denied*, 2001-1678 (La.9/21/01), 797 So.2d 674. Under Louisiana law the formation of a valid and enforceable contract requires capacity, consent, a certain object and a lawful cause. *La Bo J Partnership v. Louisiana Lottery Corp.*, 2008-1279 (La.App. 1 Cir. 1/30/09), 6 So.3d 191, *citing,* Louisiana Civil Code articles 1918, 1927, 1966,

and 1971.

Consent requires there be a meeting of the minds of the parties through an offer and acceptance. *Ricky's Diesel Service, Inc. v. Pinell*, 2004-0202 (La.App. 1 Cir. 2/11/05), 906 So.2d 536. Unless the law prescribes a certain formality for the contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. *Lambert v. Don M. Barron Contractor, Inc.*, 42,868 (La.App. 2 Cir. 1/9/08), 974 So. 2d 198, 201, *citing*, Louisiana Civil Code article 1927. A contract is formed when an offeree begins a requested performance, when an offeror invites acceptance by performance, and according to the nature of the contract it is contemplated that the performance will be completed if commenced. Louisiana Civil Code article 1939. In the absence of a legal requirement, if the parties have contemplated a certain form it is presumed that they do not intend to be bound until the contract is executed in that form. Louisiana Civil Code article 1947. When a writing is not required by law, a contract that is not reduced to writing and has a price or value in excess of five hundred dollars, must be proved by at least one witness and other corroborating circumstances. The witness may be the plaintiff and other corroborating circumstances must come from a source other than the person urging the existence of the contract, but need only be general in nature, without independent proof of every detail of the

7

agreement.  Louisiana Civil Code article 1846; *Biedenharn v. Culp*, 39,680 (La.App. 2 Cir. 8/26/05), 911 So.2d 313, 319.

A failure to perform results from nonperformance, defective performance or delay in performance, and an obligor is liable for the damages caused by his failure to perform an obligation. Louisiana Civil Code article 1994.  When a term for performance of an obligation is either fixed or clearly determinable from the circumstances, the obligor is put in default by mere arrival of that term.  Thus, when the term for performance is either express or implied, the obligee is not required to request performance, that is, to put the obligor in default.  Louisiana Civil Code article 1990; *Williams v. Sustainable Forestry 2000, L.L.C.*, 42,895 (La.App. 2 Cir. 1/9/08), 974 So.2d 178, 180.  When a delayed performance would no longer be of value to the obligee or when it is evident that the obligor will not perform, the obligee may regard the contract as dissolved without any notice to the obligor. Louisiana Civil Code article 2016.

Under the general law of obligations a fortuitous event is one that at the time of the contract was made could not have been reasonably foreseen.  Louisiana Civil Code article 1875.  When a fortuitous event makes performance impossible an obligor is not liable for his failure to perform.  A fortuitous event must prevent performance in an absolute manner, that is, it must be something that makes performance truly impossible.  An obligor is not

released from his duty to perform by the mere fact that such performance has been made more difficult or more burdensome by a fortuitious event.  Nonperformance of a contract is not excused by a fortuitous event where it may be carried into effect, although not in the matter contemplated by the obligor at the time the contract was entered into.  Therefore, the obligor must pursue reasonable alternatives to render performance in a different manner before he can take advantage of the defense of impossibility. Louisiana Civil Code article 1873; *Payne v. Hurwitz*, 2007-0081 (La.App. 1 Cir. 1/16/08), 978 So.2d 1000, 1005-06.

Performance may be rendered by a third person even against the will of the obligee, unless the obligor or the obligee has an interest in performance only by the obligor.  Louisiana Civil Code article 1855.  A remission of debt by an obligee extinguishes the obligation, and that remission may be express or tacit.  Louisiana Civil Code article 1888.

Upon dissolution of a contract the parties are restored to the situation that existed before the contract was made.  If restoration in kind is impossible or impracticable the court may award damages.  Louisiana Civil Code article 2018.  The obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made.  Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived.  An obligee must make reasonable efforts to mitigate the

9

damage caused by the obligor's failure to perform, and if he fails to do so the obligor may demand that the damages be accordingly reduced.  Louisiana Civil Code articles 1995, 1996, and 2002.

**Conversion**

The Louisiana Civil Code does not specifically identify a cause of action for "conversion." However, causes of action for conversion have been inferred from the articles providing that the right of ownership, possession, and enjoyment of movables are protected by actions for the recovery of the movables themselves, actions for restitution of their value, and actions for damages. Louisiana Civil Code articles 511, 515, 521, 524, 526, and 2315. Thus, the dispossessed owner of a corporeal movable may be accorded one of three actions to enforce his rights of ownership.

The third action, relevant to this case, is known as a delictual action, and it is available to an owner dispossessed as a result of an offense or quasi-offense.  This action is grounded on the unlawful interference with the ownership or possession of a movable and is frequently termed an action for "conversion" in Louisiana.  Conversion is an intentional tort and consists of an act in derogation of the plaintiff's possessory rights.  *Dual Drilling Co. v. Mills Equipment Investments, Inc.*, 1998-0343 (La. 12/1/98), 721 So.2d 853, 856-857; *Aymond v. State, Dept. of Revenue and Taxation*, 95-1663 (La.App. 1 Cir. 4/4/96), 672 So.2d 273, 275; *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760

10

(La. 1985).

A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel. The conversion action is predicated on the fault of the defendant and directed to the recovery of the movable, or in the alternative the plaintiff may demand compensation. *Dual Drilling Co.*, 721 So.2d at 857.

The tort of conversion is limited to major interferences with a person's rights in his movable property. Thus, although a person may have rightfully come into possession of another's goods, the subsequent refusal to surrender the goods to one who is entitled to them may constitute conversion. The deprivation of another's property does not have to be permanent to constitute conversion. In determining the seriousness of the interference with the plaintiff's rights, the factors considered include the extent and duration of the defendant's exercise of control over the property, the defendant's intent to assert a right which is inconsistent with the plaintiff's right of control, the defendant's good or bad faith, the extent and duration of the resulting interference with

11

the plaintiff's right of control and the expense and inconvenience caused to the plaintiff. *Louisiana State Bar Ass'n v. Hinrichs*, 84-1459 (La. 3/31/86), 486 So.2d 116, 120-21; *Alvarez v. Clasen*, 06-304 (La.App. 5 Cir. 10/31/06), 946 So.2d 181, 182-83.

The traditional damages for conversion consist of the return of the property itself or, if the property cannot be returned, the value of the property at the time of conversion. Damages for mental anguish and inconvenience arising from the lost use of the property may also be awarded. *Alexander v. Qwik Change Car Center*, 352 So.2d 188 (La. 1977); *Broussard Bolton, Halcomb & Vissier v. Williams*, 2001-0219 (La.App. 3 Cir. 10/3/01), 796 So.2d 791, 796; *Labbe v. Premier Bank*, 618 So.2d 45 (La.App. 3 Cir. 1993); *Quealy*, 475 So.2d at 762; *Simon v. Fasig-Tipton Co.*, 92-173 (La.App. 3 Cir. 3/22/95), 652 So.2d 1351, 1369.

## Analysis and Findings of Fact

### Existence of a Contract

The preponderance of the credible evidence established that the plaintiff and the defendants entered into a joint venture agreement for the plaintiff's daughter Jana to ride the defendants' horse Jet in 2008. Defendants' argument that there was no agreement with the plaintiff, and that any agreement was actually with the plaintiff's wife Susan and Jana, is not supported by the credible evidence. The testimony presented at trial established

that the principle terms of the agreement were not reached until the defendants met and talked with the plaintiff.  Although Susan and Jana were present at their Louisiana residence when the plaintiff and the defendants met to make an agreement, Susan and Jana did not participate in the discussions.  The uncontested evidence also established that plaintiff provided all the money needed to carry out the venture.  Susan and Jana had no source of income to finance the joint venture other than money that came from the plaintiff.  Although the evidence established that a large portion of the defendants' communications during the performance of the agreement were with Susan and Jana and the money for expenses, entry fees and winnings passed through their accounts,  this was because the plaintiff could not be on the road and go to all the rodeos, and the winnings were paid to Jana since she was the registered competitor in the events.

Defendants' argument that a valid contract did not exist because the plaintiff never presented a written contract is also not supported by the law or the evidence.  According to the defendants, the statements about drawing up a written contract were made by Susan.  Plaintiff entered into the agreement with the defendants and there is no evidence he made such a statement.  Furthermore, the plaintiff testified that he had made many oral agreements in the past, and after the agreement with the plaintiff fell apart, the defendants made a similar oral agreement with

Sheppard for her daughter to ride Jet. Even if a writing was contemplated, the defendants began performance under the terms agreed to orally in their discussions with the plaintiff. In these circumstances, the defendants' acceptance by performance formed a valid contract without the necessity of a writing.[9]

The preponderance of the credible evidence established the following terms of the agreement between the parties: (1) Jana had the exclusive right to ride Jet in events throughout 2008; (2) the 2008 events in which Jana would ride Jet were selected by the plaintiff before the defendants began performing their obligations under the contract, and he informed the defendants of these events; (3) the defendants agreed to transport and accompany Jet to the events pre-selected by the plaintiff;[10] (4) the defendants would transport Jet to the events selected by the plaintiff using the plaintiff's horse trailer and could bring one dog with them, and this was the only purpose for which the defendants were allowed to use the plaintiff's trailer; (5) the plaintiff would pay the entry fees for the events and also pay for fuel, shavings and stall fees; and (6) any money won by Jana when she rode Jet would be split

---

[9] Defendants did not begin performance until after the first of February 2008. The parties discussed and planned to be at the event on January 27 in Denver, but because Lamar was hospitalized in January the defendants could not travel to the Denver event.

[10] Plaintiff testified that he consulted with his daughter on the events that should be entered, considering the events Jet had competed in the past and the goal of competing in the NFR.

14

equally between the plaintiff and the defendants after the entry fee was deducted.

The testimony of the plaintiff, the defendants, Jana and Susan was consistent with regard to several key terms of the agreement: Jana had the exclusive right to ride Jet in events in 2008; the defendants had the use of the plaintiff's trailer to transport Jet to the events; the plaintiff paid certain travel expenses; the parties equally divided winnings after deducting the entry fees. The parties and other witnesses presented conflicting evidence on the other terms of the agreement, but the testimony contrary to the above findings as to the terms of the contract was not credible for the following reasons.

Defendants asserted that there was no agreed list or number of events Jana would enter and ride Jet.  This testimony is not credible because the defendants knew the plaintiff's ultimate goal was for Jena to compete in the NFR and that events leading up to the NFR required advance entry.  Moreover, the testimony regarding the parties' conduct and conversations during the performance of the agreement supports the finding that the defendants were aware of and knew to which events they were obligated to bring Jet for Jana to ride.  No one testified that the decision on where Jana would ride Jet was made week by week, or that there were ongoing discussions while on the road about what event they would enter next.

15

Plaintiff and the defendants also presented conflicting testimony on the question of whether Jet could travel and/or compete if the defendants were not able to bring him and be at the event. Plaintiff testified that he did not understand or agree that Jet would never travel or compete unless the defendants, or at least Diane, was present. He testified that he had an agreement for the use of the horse. Defendants both testified that the plaintiff knew and agreed that Jet would not go to events and compete without them.

Defendants' testimony on this issue is credible because it is supported by the scope of the parties' agreement and other testimony by the plaintiff. Plaintiff testified that part of the agreement was that the defendants would use his trailer to bring Jet to the events and he would provide the money for fuel. Plaintiff also testified that initially the plan was for Susan to pull the trailer driving his truck, and Diane was to ride with Susan and take Jet to the events. After their agreement fell apart, the plaintiff and someone on his behalf attempted to make a new agreement with the defendants, whereby he could pick up Jet and transport him to the events without the defendants. Defendants refused. This evidence supports the conclusion that the agreement between the parties was not limited to merely the use or lease of Jet. The parties' discussions and course of conduct demonstrate that one of the material terms agreed to by the plaintiff was that

16

the defendants would transport and accompany Jet to the events selected by the plaintiff.

### Breach of Contract

The preponderance of the credible evidence established that in May and June 2008 the defendants engaged in conduct that was a material breach of their agreement with the plaintiff.

Jana rode Jet in an event in Guymon, Oklahoma on May 2, 2008. After the Guymon event the defendants asked Jana to ride Jet in an event in Tunica, Mississippi, and later asked her to participate in an event in Starkville, Mississippi.[11] Jana declined to ride in the Tunica and Starkville events.  Neither of these events were ones that she would normally enter, and one event also conflicted with a family party planned for her college graduation.  Using the plaintiff's trailer and supplies the defendants allowed another person to ride Jet in the Tunica event.  Defendants also used the trailer to take Jet to compete with another rider at the event in Starkville.[12]  These actions by the defendants breached the contract

_____

[11] Plaintiff testified that defendants never contacted him to ask if Jana could ride in these two events.

[12] Diane testified that after the event in Guymon, the defendants spent all their money to pay for truck repairs and needed to participate in the Tunica event to earn money to get home.  Crediting this testimony does not provide a factual or legal basis to excuse the defendants breach of the agreement.  Because they agreed to allow Jana to ride Jet exclusively in 2008, the defendants were obligated to find another way to cover their expenses that did not involve someone else riding Jet.

because the parties had agreed that Jet would be ridden exclusively by Jana in 2008.

Defendants also breached the agreement when they failed to show up at an event on May 26, 2008 in Fort Smith, Arkansas. This was a selected event and the entry fee had been paid for Jana to compete riding Jet. After that the defendants also did not show up with Jet at five other events.[13] Defendants were contacted by the plaintiff during this time period, and the plaintiff specifically asked Lamar if the defendants were going to bring Jet to the event in Reno, Nevada on June 20, 2008. Lamar finally told the plaintiff that they were not going to show up in Reno.[14] Shortly thereafter the plaintiff sent McGrew to the defendants' home in Tennessee to pick up his horse trailer.

Defendants argued that they are not liable for their failure to perform because performance became impossible when they were sick from May 2, 2008 until approximately the week of June 23, 2008. However, the defendants have failed to establish this

---

[13] The scheduled events were in Fort Smith, Arkansas, Gladewater, Texas, Garden City, Kansas, Cortez, Colorado, Flagstaff, Arizona and Reno, Nevada. Plaintiff and other witnesses testified that the rodeos scheduled in the month of July 2008 were known as "Cowboy Christmas," and the events at these rodeos paid larger winnings.

[14] Diane testimony corroborates that the defendants did not intend to bring Jet to Reno. She testified that she could not make it to Reno and called Jana to tell her and wish her good luck in Reno.

defense by a preponderance of the credible evidence.[15]   Diane
presented uncontradicted testimony that she had earlier been
diagnosed with multiple sclerosis ("MS"), which is a progressive
condition.  The evidence also established that from January until
June 2008, Diane did not have MS medication.  After the defendants
left Guymon, Diane had a doctor's appointment at an MS clinic, had
blood work done, and anticipated that after the test results were
available she would get MS medications.  According to Diane, the
results did not come back until a few days after the event in Reno.
She was then able to get her MS medication and could have gone to
Greeley, which was scheduled for June 27, 2008.

Although it is uncontested that Diane has MS and did not have
MS medication to take in May and until approximately the end of
June 2008, no evidence was presented that this made it impossible
for the defendants to bring Jet to the scheduled events during this
time period.  Neither defendant testified that the doctor advised
or ordered that Diane not travel until she got her medicine.  Diane
had been without her medicine since January, but she traveled
throughout February, March and April.  Neither defendant offered
credible testimony explaining what changed about her condition or

---

[15] Although the defendants presented uncontradicted evidence
that they were unable to travel in January because of Lamar's
medical condition, they did not present any evidence or argue that
his medical condition prevented them from traveling with Jet to
events in May and June 2008.  Thus, the only evidence presented to
support the defendants' impossibility defense related to Diane's
medical problems.

symptoms in May that made her unable to travel without medication, nor why they could not travel while they were waiting for the test results and/or prescriptions to be filled.   Defendants did not present any evidence that they attempted to discuss with the plaintiff another way to get Jet to some or all of the events during this time period.   Although the defendants established that during May and June 2008 Diane had a medical condition which required doctor's treatment and medication, they did not establish by a preponderance of the credible evidence that this condition made it impossible for them to perform their obligations under the contract.

**Breach of Contract Damages**

After the defendants' actions in material breach of the contract throughout May and June and finally, the defendants' failure to bring Jet to the event in Reno on June 20, 2008, it was evident that the defendants were not performing their contractual obligations.   Therefore, without requesting performance or giving notice to the defendants, the plaintiff could regard the contract as dissolved.

When a contract is dissolved the parties should be restored as much as possible to the situation that existed before the contract was made, and damages awarded where restoration is impossible. Plaintiff sought to recover damages for the following losses: (1)

fees paid to enter events from May 26 through July 11, 2008;[16] (2) costs to regain possession of his horse trailer and damages to the interior and exterior of the trailer that were beyond normal wear and tear and caused by the defendants' neglect; (3) lost profits, based on winnings that were not earned at shows that the defendants failed to bring Jet; and (4) nonpecuniary losses, because one purpose of the contract was to further his daughter's career in barrel racing.

The preponderance of the credible evidence established that the plaintiff should recover some, but not all, of the damages he seeks.  Plaintiff did not suffer any compensable loss for paying entry fees to events that the defendants did not bring Jet. Plaintiff, the defendants and Jana all testified that even though Jana could not ride Jet she still competed in the events on other horses.  Therefore, the plaintiff did not suffer a loss of the entry fees.  The fact that Jana might have performed better if defendants had fulfilled their obligation to bring Jet to the events does not change the fact that the plaintiff made use of the entry fees he paid.

Plaintiff failed to prove by a preponderance of the evidence that he is entitled to damages for lost profits or nonpecuniary losses.  Plaintiff presented evidence that Jet was the type of

---

[16] According to Plaintiff Exhibit 4, the entry fees for the 14 events entered from May 26 at Fort Smith to July 11 at Laramie totaled $2,150.

horse needed for Jana to make it to the NFR, and evidence of the approximate winnings for the events where Jana rode Jet.[17] Without more specific evidence, however, this evidence does not provide a basis to award lost profits or damages for nonpecuniary losses. No evidence was presented on the amount that could have been won in each event. Furthermore, Jana actually competed in the events with her own horses. The court would have to assume that in each event more money would have been won, and plaintiff's goals for his daughter's career would have been achieved if she had ridden Jet. In the circumstances of this case, damages for lost profits and nonpecuniary losses would be based on speculation and therefore cannot be awarded.

After the defendants breached the agreement by letting other individuals ride Jet and failing to bring Jet to six events in a row, the plaintiff was entitled to consider the contract dissolved. At this point it was also reasonable for the plaintiff to take action to mitigate any further losses by sending someone to retrieve his horse trailer. Therefore, plaintiff is entitled to recover the $1,400 he paid to McGrew to go to Tennessee and bring the trailer back to his residence.

Plaintiff also proved by a preponderance of the credible evidence that the defendants' actions and neglect caused damage to

---

[17] Plaintiff testified that from the beginning of February to the beginning of May, his daughter did exceptionally well riding Jet and won approximately $20,000.

the interior and exterior of the trailer and he is entitled to an award of damages for this loss.[18]   Plaintiff's testimony, corroborated by that of Susan Jarreau and McGrew established the condition of the trailer when it was recovered as compared to the condition when the defendants' began using it.  With regard to the interior damage, defendants did not dispute that contrary to their agreement, they traveled with three dogs and a cat with kittens. Although there was conflicting testimony regarding whether or not one couch was damaged at the time defendants took possession, a review of the interior damages estimate shows that the damages were the result of the defendants bringing all their pets and not adequately cleaning and taking care of the interior of the trailer during the time they used it.  Nevertheless, the defendants are entitled to some reduction because of the plaintiff's failure to adequately mitigate these damages.  Plaintiff testified that he became aware of the situation with the defendants' pets and that the defendants were not cleaning or taking care of the interior of the trailer.  Yet, the only efforts by the plaintiff to mitigate the situation were to complain and on one occasion to try to clean it himself.  A 25% reduction is warranted for the failure to adequately mitigate this loss.  Plaintiff is entitled to recover

---

[18] On the issue of damages to the trailer both sides relied on some photographs.  The photos were not very helpful in depicting the condition of the trailer.  Therefore, the findings are based primarily on the testimony of the witnesses.

the amount of $3,506 to repair interior damage caused by the defendants.[19]

With regard to the exterior damage, the uncontradicted testimony of Archie Cormier established the necessary repairs to the exterior of the trailer and their cost. Defendants' testimony that they did not cause these damages is unconvincing given the testimony of plaintiff and McGrew as to the condition of the trailer when the defendants began using it and its condition when it was retrieved from the defendants' at the end of June 2008. The total of these damages is $11,538.[20]

Plaintiff stipulated that he erred in paying the defendants their winnings in Guymon and that the defendants are entitled to an offset for this amount. The payment error is $500. Subtracting this amount from the total damages results in a damage award of $15,944 for breach of contract.

**Repayment of Loans**

Plaintiff also claimed that he is entitled to repayment of certain loans/advances he made to the defendants - a $2,500 loan evidenced by a check written to Diane on November 27, 2007 and a

---

[19] Plaintiff Exhibit 3.  The total estimate was $4,675, and a 25% reduction is $1,169 (rounded to the nearest dollar).

[20] Plaintiff Exhibit 2.

$500 loan evidenced by a check made out to her on January 2, 2008.[21]
Defendants did not offer any evidence to dispute that the plaintiff
loaned them these funds.  Rather, they argued the evidence
establishes that the plaintiff is estopped from demanding
repayment.

A preponderance of the credible evidence does not support
defendants' position.  Defendants principally relied on the
testimony of Sheppard to establish this defense.  However, given
Sheppard's testimony relating the substance and timing of her
conversation with the plaintiff, it is not reasonable to conclude
that she was attempting to repay the defendants' loans.  Her
testimony was essentially that she was trying to help the
defendants and was willing to pay up to a certain amount to get
their trailer back from the plaintiff.  When the plaintiff informed
her that suit had been filed and the situation involved more than
just returning the defendants' trailer, Sheppard dropped her
efforts to help the defendants.[22]  Therefore, the defendants are
obligated to repay the loans, which total $3,000.

Plaintiff also sought to recover $600 he paid to McGrew to

---

[21] Plaintiff Exhibit 1.

[22] Plaintiff was obligated under the agreement to split the
winnings with the defendants after deducting the entry fee.
Defendants did not provide any legal or factual basis to support
their argument that the plaintiff's failure to unilaterally
withhold loan payments from their winnings waived his right to
collect the debts.

transport one of the defendants' horses.  Plaintiff failed to establish by a preponderance of the evidence that this was a loan to the defendants.  The testimony of the plaintiff, defendants and McGrew regarding this event supports the conclusion that the plaintiff was responding to the defendants' request for help with their horse and in essence doing a favor for them.  Plaintiff enlisted McGrew's help to transport the horse, and he agreed to do so as a favor to the plaintiff and only received $600 to cover his travel expenses.  There is no credible evidence that the plaintiff agreed to transport the horse in return for the defendants' promise to repay the money he expended to do so.

**Conversion**

Defendants presented convincing evidence that plaintiff converted their horse trailer.  When plaintiff informed the defendants that he was sending someone to pick up his trailer defendants asked him to return their trailer.  Plaintiff rejected their request.  Plaintiff would not allow the defendants on his property, and without good reason would not return their trailer when he picked up his own.  Plaintiff's explanation for his refusal was concerns he had about insurance coverage and the condition of the trailer.  Plaintiff's testimony on this issue is unpersuasive and not supported by credible evidence.  Because of the plaintiff's actions the defendants were not able to regain possession of their trailer until approximately eight months after the contract was

dissolved.[23]   Therefore, a preponderance of the credible evidence establishes that the plaintiff's refusal to return the defendants' trailer constituted a major interference with their rights in this moveable property and a conversion under state law.

Nevertheless, the defendants did not offer sufficient evidence to establish that they suffered any actual damages as a result of the conversion.  Lamar testified that when the trailer was returned it had damage to the interior from water and mildew, but stated that he could fix the damage himself.  Defendants claimed lost income because they had no trailer to transport Jet to events, but they offered no factual basis for an award of any actual or potential lost income.  While defendants testified as to the general worry and inconvenience caused by the conversion, the testimony was too vague to support an award of specific damages for mental anguish and inconvenience.

## Conclusions of Law

Plaintiff and defendants formed a joint venture contractual agreement for plaintiff's daughter Jana to have the exclusive right during 2008 to ride defendants' horse Jet in events pre-selected by the plaintiff.  Defendants materially breached this agreement by using the plaintiff's trailer to transport Jet to events not

---

[23] Record document number 11 (report from settlement conference held on February 9, 2009).

selected by the plaintiff where they allowed other individuals to ride Jet, and by repeatedly not showing up for events in May and June 2008 that had been selected by the plaintiff.  As a result of the defendants' breach of the contract, the plaintiff sustained damages in the amount of $16,444.  Because of the plaintiff's stipulation that he erred by giving the defendants $500 less than they earned in winnings at Guymon, the defendants are entitled to offset this amount.  Consequently, the plaintiff is entitled to recover damages for breach of contract of $15,944.

Defendants are obligated to repay to the plaintiff, loans and advances totaling $3,000.

Plaintiff wrongfully interfered with defendants' property rights in their horse trailer and is liable for conversion of this property.  Defendants failed to prove that the plaintiff's conversion caused them any compensable damages.

Judgment will be rendered in favor of the plaintiff Doherty Michael Jarreau against defendants Diane and Lamar Quakenbush in the amount of $18,944.  Defendants' counterclaim for conversion will be dismissed with prejudice.

Baton Rouge, Louisiana, February 1, 2010.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE